Filed 8/10/21

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MERIDIAN FINANCIAL SERVICES, INC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> LANANH PHAN et al., <br><br> Defendants and Respondents. | D078586, D078589 <br><br><br> (Superior Court Case No. 2013-1-CV-254980) |

APPEAL from judgments of the Superior Court of Santa Clara County, Thomas E. Kuhnle, Judge. Affirmed.

Patton Sullivan Brodehl and Kevin R. Brodehl, for Plaintiffs and Appellants.

Fidelity National Law Group, David B. Owen; Greines, Martin, Stein & Richland and Robin Meadow for Defendant and Respondent Chicago Title Company.

No appearances for Defendants and Respondents Jodie Nguyen, Diana Tran, and Jeannie Vuong.

INTRODUCTION

Mark Yazdani, a Stanford-educated economist and licensed real estate broker, is the president and sole owner of Meridian Financial Services, Inc. (Meridian).[1] Over the span of a year, Yazdani made a series of investments totaling $5,079,000 in an international gold-trading scheme run by a loan broker, Lananh Phan, who promised him "guaranteed" returns of 5 or 6 percent per month. He conducted no due diligence into the legality or legitimacy of the investment. It turned out to be a Ponzi scheme and when it collapsed, Yazdani lost most of his money.

In exchange for some of his investments, Yazdani demanded "collateral" from Phan. For an initial investment of $500,000, Phan offered a promissory note secured by a deed of trust in Meridian's favor on her personal residence. For a subsequent investment of $900,000, Phan offered two more promissory notes of $650,000 and $250,000 to be secured by deeds of trust in Meridian's favor on the personal residences of unwitting third parties ensnared in Phan's fraudulent scheme (the Meridian deeds of trust).

All of the collateral on Yazdani's investments were set up as "loans" and facilitated through escrow at Chicago Title Company (Chicago Title) by Diane Do, an escrow officer Yazdani met in an unrelated real estate transaction and who invited Yazdani to invest with Phan. Yazdani signed "Lenders Escrow Instructions" for these transactions, identifying Meridian as "the lender" and the various third parties whose homes were encumbered as "the borrowers" of the loan funds, although he admittedly had no expectation these individuals would receive any money. Without communicating with any of the purported borrowers, he caused loan documents to be prepared,

---

[1] Because Yazdani was the only person acting on behalf of Meridian, we generally do not distinguish between the two, unless necessary.

gave Phan's personal address as the borrowers' mailing addresses, and gave his own personal email address as the borrowers' email addresses for the loan documents. Although the "lender," Yazdani received all of the borrowers' loan documents. The purported borrowers never knew of these transactions; their signatures on the Meridian deeds of trusts were forged or obtained by Phan under false pretenses. Yazdani had been made aware of "irregularities" with the execution and notarization of the Meridian deeds of trust. After the Ponzi scheme collapsed and unable to recover his investment, he moved to foreclose on the purported borrowers.

From these events, two lawsuits arose. In the first lawsuit, two of the purported borrowers sued Yazdani and Meridian (collectively, Appellants) to prevent foreclosure of their home and to quiet title to their home. After a bench trial, the trial judge cancelled the Meridian deeds of trust, finding that they were "forged" and that Appellants had acted with unclean hands in procuring them (the Orange County decision). However, the parties later settled and, as a condition of settlement, obtained a stipulated order from a different judge vacating most of the trial judge's decision, including the part that contained the finding of Appellants' unclean hands.

The second lawsuit is this one. Appellants sued Chicago Title, among others, alleging they were induced to invest with Phan because Chicago Title's involvement in the transactions reassured them that Phan's investment scheme was "legitimate, sound, approved and entered freely into by all concerned parties." They sought to recover almost $9,000,000—their investment principal plus accrued guaranteed monthly interest—as well as punitive damages. Appellants have also sued more than 50 individuals who allegedly received payments from Phan, asserting that they are Phan's creditors and the transfers of money to the individuals should be set aside.

3

Chicago Title moved for summary judgment based on its defense of unclean hands, arguing in part that Appellants were collaterally estopped from relitigating the earlier finding of their unclean hands in the Orange County decision. The trial court in this case agreed the prior decision was issue-preclusive and concluded Appellants were barred from any recovery. It granted summary judgment for Chicago Title on this ground without reaching alternative bases for summary judgment or summary adjudication raised in Chicago Title's motion. The individual respondents' virtually identical summary judgment motion was also granted on the basis of their unclean hands defense. After entry of judgment, the court awarded Chicago Title attorney fees of $943,250.

Appellants appeal both judgments and the award of attorney fees. They contend the trial court erred in giving preclusive effect to the Orange County decision because, they argue, none of the elements of issue preclusion were satisfied and that equitable concerns militate against applying issue preclusion in this instance. They argue the award of attorney fees was grossly excessive and an abuse of discretion. Finding no merit to these contentions, we affirm the judgments and the fee award.

FACTUAL AND PROCEDURAL BACKGROUND[2]

## I.

### *The Parties*

Yazdani, the president and sole owner of Meridian, holds a Ph.D. in economics from Stanford University. He is the principal of FMY Associates, a financial and regulatory consulting firm, and in that capacity conducts due diligence for clients in the electric industry. He is also a licensed real estate broker and has been an active real estate investor, buying and selling properties in over 160 real estate transactions, since the late 1990s.

Chicago Title provides escrow services for real estate transactions. Its corporate sibling, non-party Chicago Title Insurance Company (CTIC), writes title insurance for real property transactions.

Do was a Chicago Title escrow officer from 2009 to 2013. Phan was a loan broker and a friend of Do's who was never employed by Chicago Title.

## II.

### *The Ponzi Scheme*

Yazdani first met Do in February 2012 during an unrelated real estate transaction in which Chicago Title served as the escrow holder. In March 2012, Do invited Yazdani to invest with Phan. Phan told Yazdani the investment involved "buying gold from a gold mine" at "wholesale" in one country and selling it at "retail" in another country. She said the investment

---

[2]    Because this is an appeal from a grant of summary judgment in favor of Chicago Title, we examine the evidence de novo and "our account of the facts is presented in the light most favorable to the nonmoving party below, in this case [Appellants], and assumes that, for purposes of our analysis, [Appellants'] version of all disputed facts is the correct one." (*Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, 999; accord *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 470.)

paid her an average return of 12 to 15 percent per month, and that she was "very happy" to give her investors 5 or 6 percent per month, a return she said was "guaranteed."

Phan and Do did not give Yazdani any other information about the nature or mechanics of the investment, or explain how it was possible to pay investors a guaranteed return of 5 to 6 percent each month. Phan told Yazdani the investment "is like an invention that her and her group came up with and it was very successful." She said the mechanics of the investment had to be kept secret because no one else knew how to conduct the transactions, and if she gave Yazdani the details, he "could become a competitor and do the same thing that they were doing." Phan and Do did not tell Yazdani the countries where the gold was being purchased or sold, or how the gold was being transported in and out of the countries.

Between March and April 2012, Yazdani had several meetings with Phan and Do at various restaurants, which were sometimes joined by other participants in Phan's investment. During these meetings, Phan, Do and the other investors touted the benefits of Phan's investment. Do bragged about how she and "everyone around her got rich off of this" investment. The women showed off "[a]ll the cars, the jewelry . . . [and] $12,000 [Birkin] bags" they had purchased with their wealth.

Yazdani initially declined to invest with Phan. He "didn't know enough details" and "couldn't really judge whether it was a good investment or not, whether it was safe or not." However, in April 2012, he agreed to invest $500,000 with Phan provided that he receive "real collateral" to secure his investment. "They said, fine, we'll give you Phan's house as collateral." So Phan offered, and Yazdani accepted, a $500,000 promissory note secured by a

6

deed of trust on her personal residence. Title to the property was held in the name of Phan's husband, Hai Nguyen (Hai).

Two weeks before making the first investment with Phan, on March 24, 2012, Yazdani instructed Do to delete all of his emails from her Chicago Title email account and to use a private email address "for their future communications relating to the investment." He felt the correspondence "had become personal, not work related, and it was not appropriate to send personal emails through work related email addresses." In the email, Yazdani told Do: "I wish you would delete the old emails, why risk it. I will email the other address from now on." Yazdani also did not conduct any due diligence to determine the legality or legitimacy of the investment, including researching the "concept of buying at [a] gold mine and transacting it by moving it to another country." He also never received any documentation about the investment from Phan or Do.

To facilitate the investment transaction, Do opened an escrow account with Chicago Title. Initially, Phan and Do "didn't want it to go through escrow" but Yazdani insisted that it go through a title company. In order to complete the transaction, Yazdani executed and submitted to Chicago Title "Lender's Escrow Instructions" that identified Meridian as the "lender" and Hai as the "borrower" of $500,000. Because it was represented to be a loan, CTIC issued a policy of title insurance on the transaction.

Between April and December 2012, Yazdani made approximately 15 additional investments with Phan totaling about $3 million. As security for these investments, Phan and Do gave Yazdani unsecured promissory notes. During the same period, he received approximately $300,000 in investment returns from Phan but did not receive "any kind of accounting or statements" from Phan, or Do.

7

In December 2012, Yazdani invested another $900,000, consisting of a $650,000 investment followed by a second $250,000 investment. Yazdani demanded Phan and Do provide him with additional security, but told them he was "becoming uncomfortable with investing based on these straight notes" and he wanted "a secure type of investment." "So [they] went back and forth about that" until Phan said, "[m]y partners are willing to put up their properties now."

Phan then offered to secure Yazdani's two investments with five separate deeds of trust covering multiple parcels of real property located in Southern California owned by third parties (the cross-collateralized loans). According to Yazdani, he was told these individuals "were friends, family and investors who would benefit from an expansion in the business, and so they were such good friends with Phan, that they were willing to put up their properties so that Phan can expand her business and Phan was also a co-owner in one of the properties."

In connection with the cross-collateralized loans, Yazdani again executed and submitted to Chicago Title "Lender's Escrow Instructions" that identified Meridian as the "lender," and the individual third-party homeowners as "borrowers" of loan funds to be secured by the various parcels of real property. Because they were again represented to be loans, CTIC issued title insurance policies on the transactions.

Yazdani hired non-party PLM Loan Management Services (PLM) to prepare loan documents for the transactions. He provided Phan's residential address to PLM as the mailing address to be used for each of the purported borrowers whose properties were being used as collateral. He knew the borrowers' properties were "[p]robably" in Southern California, whereas Phan's residential address was in Northern California.

8

Yazdani also gave PLM his own personal email address as the email address PLM should use to send all borrower documents. Yazdani explained that Do told him to send all borrower documents to her, "so [he] asked PLM to send the documents to [him] so [he] can forward to [Do at] Chicago Title." He did not have borrower documents sent directly to Do because he "wanted to review the documents once before . . . send[ing] them over" to Do. And he did "[b]riefly" review all borrower documents sent by PLM.

Yazdani never contacted any of the individuals putting up their property as collateral for his investments. None of the purported borrowers completed loan applications; he never asked them to do so. Despite receiving all borrower documents at his personal email, Yazdani never sent truth-in-lending documents to any of the purported borrowers. None of the purported borrowers received any loan funds, and Yazdani admitted he had "no expectation of money going to the borrowers."

The purported borrowers in the cross-collateralized loans—Vincent Le, Huyen Nguyen, Dan Nguyen, Trang Nguyen, John Vo, Lethu Nguyen, Michelle Bui, and Lee Bui—never knew about the loans and never authorized Phan to use their properties as security for Yazdani's investments. They were all first-generation immigrants from Vietnam who came to the United States as adults, and were friends and family members of Phan who "knew and trusted" her. Phan had either forged their signatures on powers of attorney or duped them into signing powers of attorney on the pretense that she was looking into refinancing their homes. With the powers of attorney, Phan executed two promissory notes in favor of Meridian to secure Yazdani's investments, one for $650,000 on December 18, 2012 and another for $250,000 on January 31, 2013. She collateralized the notes with deeds of trust encumbering the homes of these unwitting individuals in favor of

Meridian.  In some instances, Phan did not bother with the powers of attorneys and simply forged their signatures on the necessary instruments.[3]

### III.

### *The Ponzi Scheme Exposed*

On January 23, 2013, Chicago Title received a report from one of its employees that Do was conducting outside business within Chicago Title's offices.  Until then, quarterly random audits of Do's escrow files had turned up no improprieties.  On January 30, Chicago Title audited Do's escrow files.  It discovered that Do had handled five escrow transactions in December 2012 involving Phan, in which all of the purported borrowers' funds went to Phan, and deeds of trust were recorded before the disbursement of any funds.  The audit also revealed that Do had notarized several of the purported borrowers' signatures without them being present.

During its investigation, Chicago Title also learned that Do had approached several other Chicago Title employees to invest with Phan.  For example, in late 2011, while having lunch with Do, Sherri Sweeney noticed Do was carrying a large amount of cash in her purse, approximately $2,000 to $3,000, and asked Do where she got the money.  Do said the cash was from an investment she was making through "a Vietnamese investment group with [her] friend Anh."  Several months later in the office, Do asked Sweeney if she was interested in investing with her Vietnamese group.  She told Sweeney: "My friend Anh buys gold bars outside of the country, maybe Vietnam.  And then she resells them on the black market."  Sweeney declined

---

[3]    These facts are as alleged in the Verified Cross-Complaint filed by Dan Nguyen, Trang Nguyen, John Vo, Lethu Nguyen, Michelle Bui, and Lee Bui, whom Appellants sued along with Chicago Title in the instant action from which this appeal arises; they sought cancellation of the forged instruments and to quiet title to their homes.

to invest, telling Do, "it doesn't sound right. . . . it sounds like something out of [the] Madoff series, like a Ponzi scheme." The investment scheme reminded Sweeney of "Bernie Madoff" and "all the people that he duped." But Do laughed and said she wasn't doing anything illegal. Sweeney believed Do's investments were personal and were being done outside of Chicago Title, and since Do assured her they were legal, she did not inquire further.

On February 7, 2013, Do was forced to resign from Chicago Title after being informed of the company's findings of "inappropriate escrow process[es]." Chicago Title referred the matter to the Santa Clara County District Attorney, the Internal Revenue Services, and the California Secretary of State for further investigation.

Within several days of her termination, Do left Yazdani a message telling him that " '[she] resigned' " from Chicago Title. A few days later, Yazdani met Do at a beauty salon in someone's home; there was a group of five or six people present. Although "half the conversation was in Vietnamese," in English, Do told Yazdani she resigned because "there were some irregularities in the signatures that were provided in association with these two transactions," presumably the December 18, 2012 $650,000 note and the January 31, 2013 $250,000 note. Do told Yazdani "that she was not present when the documents were signed, and she notarized the documents afterwards" and "that was the reason for her departure."

After learning there were signature "irregularities," Yazdani called Chicago Title, spoke to supervisor Kevin Chiarello, and offered to "reconvey the deeds of trust to allow Chicago Title . . . to obtain proper deeds of trust, with proper notarization." The offer was not accepted. During this conversation, Chiarello did not "warn [Yazdani] away from further contact with Ms. Do, . . . never informed [him] about the Ponzi scheme," and "did

11

nothing to raise the flag of alarm about the multiple questioned transactions."

From April 2, 2013 to June 26, 2013, Yazdani invested another $800,000 with Phan. In the months that followed, Phan's gold investment was exposed as a Ponzi scheme and it collapsed. She failed to return Yazdani's investment principal of $5,079,000, or pay the promised returns. Phan and Do were convicted of several felony criminal offenses as a result of the Ponzi scheme.

## IV.

### *The Orange County Action*

A. *The Complaint*

In September 2013, when he found himself unable to recover his money, Yazdani began foreclosure proceedings against the properties securing his investments, or the cross-collateralized loans. In October 2013, to prevent foreclosure on their home, Vincent C. Le (Vincent) and Huyen Dinh Nguyen (Huyen) filed an action in Orange County Superior Court against Phan and her husband, Hai, and Appellants (the Orange County action).[4]

---

[4] The trial court granted Chicago Title's unopposed request for judicial notice of the complaint filed by Vincent and Huyen in the Orange County action. On summary judgment review, we consider any evidence to which no objection (or an unsound objection) was made and therefore may properly consider the complaint. (*Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118.) The complaint was captioned *Vincent Chi Le, et al. v. Hai Dinh Nguyen, et al.*, Orange County Superior Court, Case No. 30-2013-00681756-CU-OR-CJC. In addition to Hai, Phan, and Appellants, named defendants in the Orange County action included Chicago Title, PLM, and other individuals.

Vincent and Huyen requested, among other relief, an injunction to stop Meridian from foreclosing on their home. They also sought to quiet title to their property as against Phan, Hai, and Appellants and in this regard requested "a specific judicial declaration that [the cross-collateralized loans] were . . . null and void from their inception, having been obtained . . . through a series of secret fraudulent actions that would never have occurred had [Appellants] exercised due care, or even any care, in terms of a lender's responsibilities under the relevant circumstances."

B.     *Statement of Decision and Judgment After Trial*

In April 2017, Vincent and Huyen's claims against Appellants were tried in a bench trial before Judge David T. McEachen. On April 19, 2017, Judge McEachen issued a 14-page "Statement of Decision and Judgment" (the statement of decision). As this statement of decision is central to this appeal, we describe it in detail.

Judge McEachen noted that both sides presented evidence, witnesses and submitted proposed statements of decisions in lieu of final argument over two days of trial, on April 4 and April 5, 2017.

In the first three pages of the statement of decision, Judge McEachen evaluated Vincent and Huyen's default prove-up on their quiet title claim against Phan and Hai. He found that Vincent, a bus driver, and Huyen, an employee for Hyundai, were immigrants from Vietnam. They bought their first and only home in 1998. Hai is Huyen's brother and Phan is Huyen's sister-in-law. Both Vincent and Huyen "looked up to Hai and Phan as the wealthiest and most successful members" of their family. Phan helped them buy the home and arranged two refinances of the property. Although Vincent and Huyen bought their home in their own name, Hai and Phan "wound up on title as joint tenants" twice, the first time in 1999 a year after the initial

13

purchase and the second time during a 2003 refinance. "Vincent and Huyen signed the deeds due to their trust in their wealthy and sophisticated sister-in-law [Phan]." Judge McEachen concluded that "[d]espite the manner title was held," Vincent and Huyen were the sole owners of the property and quieted title in their favor and removed Hai and Phan from title.

In the next 11 pages of the statement of decision, Judge McEachen made factual findings as to the trial evidence relating to Vincent and Huyen's claims against Appellants. The evidence, as summarized by Judge McEachen, related to Phan's investment scheme (in which Huyen had also participated) and the sequence of events by which Yazdani came to invest and then participate in the securitization of his investments, including with the promissory note and deed of trust recorded in Meridian's favor on Vincent and Huyen's home. Judge McEachen found, among other facts, the following:

"Yazdani is a sophisticated real estate investor" with a Ph.D. in economics from Stanford, who "has been working in real estate 'flipping' houses for years," including approximately 140 houses between 2010 and 2014. "Despite this level of sophistication, Yazdani did very little due diligence before choosing to invest with Phan." Although "[n]either Phan nor Do had any expertise in commodities," "Yazdani appeared to have no interest in vetting the investment and simply trusted that an escrow officer . . . and a real estate broker . . . were operating a legitimate gold commodities trading business."

Yazdani "insisted that Phan provide him with a trust deed on her home" to secure his initial $500,000 investment, which was accompanied by "a promissory note which indicated that Yazdani would be paid 10% per month on his investment. Thus, he disguised his investment as a 'loan.'" "Before accepting the trust deed, Yazdani did his due diligence on the

14

property.  Through Zillow, he determined the property's approximate value. He also determined the number of bedrooms and confirmed it was Phan's personal residence."

Phan asked Yazdani to make an additional $650,000 investment in December 2012.  "Curiously, unlike the $2.5 million prior unsecured investment he made (only $500,000 of the $3 million was secured by the trust deed on Phan's home) just few months earlier, Yazdani was now insisting on security in the form of trust deeds recorded against real property."  "Yazdani claims that Phan promised that friends and relatives in Southern California would agree to put up their property as collateral for this additional investment.  Yazdani did nothing to verify this."

"Yazdani contracted with PLM . . . to draft loan documents" and "personally completed the application and transmitted it to PLM."  "The application expressly included a box for where the borrower's loan documents should be sent.  He instructed PLM that the loan documents should not be sent to the borrowers, but should instead be sent to his own email address[.]"  "This assured that the purported borrowers would have no notice of the trust deeds."

"Yazdani did no due diligence on any of the borrowers.  He never contacted the borrowers.  He incorrectly stated on the application that the homes were not owner occupied (and did nothing to verify whether this was true or not).  He provided a mailing address for the borrowers of Phan's personal residence despite knowing that none of the borrowers lived there (even Phan stated they lived in Southern California).  None of the borrowers completed a loan application.  And, most tellingly, he failed to secure the borrower's signature and telephone number on the application he completed with PLM."  "Yazdani admitted that none of the borrowers would be receiving

the loan funds and could establish no logical reason why these people should be putting their properties at risk."

Yazdani received loan documents from PLM, which included a note and deed of trust, first payment letter with a first payment due January 18, 2013, loan escrow addendum (with no source of repayment indicated), fire insurance authorization, address and phone number certification (never completed by the borrowers), a declaration of non-owner occupancy (indicating Phan's home as the principal residence for all 8 borrowers), and a declaration of loan purpose and nature of the security (with no information provided). Judge McEachen found that a "cursory examination of the signatures on all the documents shows to a layman that they were all signed by the same person – the handwriting is identical."

"Yazdani purportedly invested another $250,000 with Phan on January 30, 2013. The actions he took with respect to the first note and deed of trust (failure to do any due diligence, having loan documents sent to him, ignoring . . . obviously forged signatures, listing Phan's home as the borrower's personal residence[,] etc.) were repeated with this second 'loan' " and "[t]he only differences between the first and second loan are the loan amount and the fact that only two properties were encumbered for this smaller dollar loan."

Vincent and "Huyen's first notice of the [Meridian deeds of trust] was when [Huyen] received a packet of materials from Chicago Title in mid to late February 2013," and "included information pertaining only to the $250,000 loan, not the December 2012 $650,000 loan." On February 8, 2013, Phan flew down to Orange County "with no notice" and "told Vincent and Huyen that they had forgotten to sign the notary book for their 2010 refinance." So,

"Vincent and Huyen signed the book with no indication of what document they were attesting to having signed."

After making these factual findings, Judge McEachen proceeded to decide 13 controverted issues. In the first seven issues, Judge McEachen concluded the Meridian deeds of trust recorded against Vincent and Huyen's home were "forged," and Vincent and Huyen did not authorize Phan, Hai, or Do to sign their signatures on the Meridian deeds of trust and the related loan documents. Judge McEachen also concluded that Vincent and Huyen were not estopped or barred from challenging the Meridian deeds of trust by the doctrine of unclean hands, finding that there was no evidence of any misconduct on their part. In the tenth issue, Judge McEachen concluded the Meridian deeds of trust should be cancelled pursuant to Civil Code section 3412 because the instruments were forgeries.[5] In the twelfth issue, Judge McEachen ruled that title to Vincent and Huyen's home should be quieted in their favor "by cancellation or otherwise invalidating the Meridian [deeds of trust]" due to the forgeries.

In concluding title should be quieted in Vincent and Huyen's favor, Judge McEachen ruled that "Meridian/Yazdani's unclean hands also mandate this remedy." Judge McEachen reasoned that: "Though unclean hands is an affirmative defense, in this case the suit is seeking to bar the affirmative claim of Meridian seeking to foreclose on [Vincent and Huyen's] property. Thus, though Plaintiffs initiated this suit and there is no cross-complaint, the suit was precipitated by a notice of default seeking to foreclose on [their]

_____

[5]    Civil Code section 3412 provides: "A written instrument, in respect to which there is a reasonable apprehension that if left outstanding it may cause serious injury to a person against whom it is void or voidable, may, upon his application, be so adjudged, and ordered to be delivered up or canceled."

17

property.  Thus plaintiffs are in fact in the defensive posture.  They can assert unclean hands to bar the foreclosure initiated by Meridian.  They seek injunctive relief and the court enjoins Meridian from foreclosing on the . . . property and quiet title by cancelling the trust deeds."

Judge McEachen found: "Meridian/Yazdani's unclean hands in procuring the trust deed and other loan documents mandate that the trust deed be cancelled.  Meridian took affirmative steps to prevent Plaintiffs from having notice of the purported loans/trust deeds.  Rather than having the loan documents sent to the borrowers, Meridian had the documents sent to Yazdani.  Yazdani had the mailing address and principal residence of the Plaintiffs and the other purported borrowers listed as Phan's home even though he knew the house did not hold eight couples and with knowledge from Phan that the purported borrowers lived in Southern California."  Further, "Yazdani made no effort to have the loan documents completed, to review the loan documents or determine [the] source of repayment.  If he had even looked at the loan documents he would have seen [the] missing signatures and information.  To the extent there were signatures, a layman could see that the eight signatures of the purported borrowers were all in the same handwriting.  He did not look to the Plaintiffs as borrowers as he never sent out a payment letter or attempted to foreclose when no payment was received.  Throughout this, he also knew that the loan proceeds were not going to any of the purported borrowers.  Yazdani allowed the Plaintiffs to be defrauded by his willful ignorance."

Judge McEachen concluded the statement of decision by ordering title to Vincent and Huyen's home quieted against Phan, Hai, and Appellants, and cancelled the Meridian deeds of trust.  Judge McEachen then signed the statement of decision.

18

C.    *Stipulated Order Vacating Portions of Statement of Decision and Judgment*

Shortly after Judge McEachen issued the statement of decision, Appellants filed a "Motion to Vacate and Set Aside the Judgment under Code of Civil Procedure section 663," which was set for hearing on June 23, 2017 before Judge McEachen.  However on June 7, 2017, Vincent, Huyen, and Appellants settled their dispute and submitted a "Stipulation for Order Vacating Portions of Statement of Decision and Judgment" (the stipulated order for vacatur) to Judge William M. Monroe.

The parties stipulated "for an order vacating portions of the Court's April 19, 2017 Statement of Decision and Judgment," and set forth the following recitals:

"WHEREAS, Meridian and Yazdani have a pending motion to vacate judgment set for hearing on June 23, 2017;

"WHEREAS, in recognition of the substantial expense and time involved in litigation (including post-trial motion and appellate expenses), and to conserve judicial resources, [the parties] have agreed to settle and resolve finally and completely any and all issues and claims between them. As a contingent condition of the settlement, the Parties request that the Court vacate the portions [of] its Statement of Decision and Judgment concerning Huyen and Vincent's claims against Meridian and Yazdani."

Specifically, the parties agreed the court enter an order vacating "Page 3, line 9 through page 14, line 10" while "[t]he remainder of the Statement of Decision and Judgment shall remain in full force and effect."  The parties stipulated the order would be "pursuant to [the court's] powers, and for good cause" but provided no further explanation of the good cause.

The parties provided a proposed order, which Judge Monroe signed on June 7, 2017.  The order stated in its entirety:  "The foregoing stipulation

19

having been duly considered by the Court, and good cause showing therefrom, [¶] GOOD CAUSE APPEARING, IT IS THEREFORE ORDERED:

"1.    The following portions of the Court's Statement of Decision and Judgment, entered on April 19, 2017, are vacated:  Page 3, line 9 through page 14, line 10.

"2.    The remainder of the Statement of Decision and Judgment shall remain in full force and effect."

Page 3, line 9 through page 14, line 10 of the statement of decision (i.e., the portions vacated by the stipulated order) comprised the entire 11-page discussion in which Judge McEachen had set forth his factual findings and decisions on the controverted issues relating to Vincent and Huyen's claims against Appellants, including his finding of their unclean hands.  What remained intact following the vacatur was the first three pages of the decision, ending with the statement "[t]he sole parties presently on title are Vincent and Huyen," and Judge McEachen's signature at the end of the decision.  Thus, the parties removed the rationale of Judge McEachen's decision but left intact the result—the quieting of Vincent and Huyen's title to their home.

V.

*The Santa Clara Action*

A.    *The Complaint*

On October 22, 2013, Appellants filed the current action in Santa Clara County Superior Court.  The named defendants in their operative third amended complaint (the complaint) include Chicago Title, Phan, Do, and over 50 other individual defendants.  As to Chicago Title, Appellants asserted causes of action for fraud, fraud in the inducement, negligent misrepresentation, violation of the Unfair Business Practices Act, escrow

20

negligence, negligent supervision (of Do), breach of fiduciary duty, and breach of written contract.

Appellants alleged they had invested the aggregate principle of $5,079,000 with Phan, and with reinvested "profits" the total investment amount was $9,140,417. However, Phan's "gold investment vehicle" turned out to be "nothing more than an illegitimate and illegal scheme . . . designed to dupe investors." Chicago Title was liable to Appellants, they alleged, because Yazdani "was reassured by the involvement" of Chicago Title and its escrow officer and notary, Do, and "that the investments he and M[eridian] were entering into were legitimate, sound, approved and entered freely into by all concerned parties, including the individuals who were providing security for the investments." "By virtue of C[hicago] T[itle's] involvement, and the security and assurances provided by its escrow officer and notary, D[o], Plaintiffs not only were induced to make their initial investments with P[han], but all of the follow-up investments ultimately made, including those investments for which real property security and promissory notes were not obtained." Appellants sought, among other relief, compensatory damages of "not less than $8,900,000" as well as punitive damages against Chicago Title.

The more than 50 individual defendants were named in a single cause of action pursuant to the Uniform Fraudulent Transfer Act (UFTA), Civil Code sections 3439, et seq. (now the Uniform Voidable Transactions Act).[6] Appellants alleged they were creditors of Do and Phan, that the individuals had received payments from Do and Phan that were made with the intent to

---

[6] "[T]he Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq.) permits a defrauded creditor to reach property that has been fraudulently transferred by a judgment debtor to a third party." (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1160, fn. 14.)

21

defraud Appellants, and that these payments should therefore be set aside. Three of these individuals, Jodie Nguyen, Diana Tran, and Jeannie Vuong (the UFTA defendants) are respondents in this appeal.

Chicago Title and the UFTA defendants separately filed answers to the complaint asserting, among other defenses, the affirmative defense of unclean hands.

B.      *Summary Judgment Motions*

On September 24, 2018, Chicago Title moved for summary judgment, or alternatively, summary adjudication of all causes of action alleged against it and the request for punitive damages.  Chicago Title argued that unclean hands was a complete defense to all causes of action and sought to establish the defense on two independent grounds.  First, it argued the court in the Orange County action had already determined that Appellants acted with unclean hands in connection with the transactions at issue and Appellants were collaterally estopped from relitigating their unclean hands in this action.  Second, Chicago Title argued the undisputed material facts separately established that Appellants acted with unclean hands. Alternatively, Chicago Title sought summary adjudication that Do's alleged wrongful acts were outside the course and scope of her employment, that it did not ratify any of Do's alleged acts, and that there was no basis for punitive damages.

In support of collateral estoppel, Chicago Title requested the Santa Clara court take judicial notice of the complaint in the Orange County action, as well as the statement of decision, the UFTA defendants' cross-complaint, and the stipulated order for vacatur.[7]  Chicago Title acknowledged that the

---

[7]      The trial court granted Chicago Title's request for judicial notice of these documents in the Orange County action.

22

part of the statement of decision that contained Judge McEachen's finding of Appellants' unclean hands had been vacated by the stipulated order for vacatur. However, it argued that issue preclusion can apply to a judgment vacated pursuant to a settlement.

In opposing the motion, Appellants argued the Santa Clara court could not give preclusive effect to Judge McEachen's finding that Appellants acted with unclean hands, for numerous reasons. First, it asserted that Judge McEachen failed to comply with Code of Civil Procedure section 632 by first issuing a "tentative" decision,[8] and therefore, regardless of its name ("a Statement of Decision and Judgment"), the statement of decision was not, as a matter of law, a "final" judgment and therefore has no preclusive effect. Rather, the statement of decision was "revised" and only became final when the Orange County court entered the stipulated order for vacatur, striking all of the findings related to Appellants' unclean hands. Thus, Appellants argued "[t]he revised Statement of Decision, with the adverse findings stricken, is the only citable judgment, and it is immaterial to any issue here except to prove that the falsified deeds of trust . . . were forged and fraudulent."

Second, Appellants argued the question of their unclean hands was "not properly before the Orange County court" because "[u]nclean hands is a defense, and may only be found against a plaintiff seeking relief in court," not

---

[8] Appellants, however, did not seek judicial notice of any records from the Orange County action establishing the truth of this assertion. Indeed, Appellants objected to Chicago Title's supplemental request that the trial court take judicial notice of the Register of Actions for the Orange County action, which Chicago Title filed late with its reply brief in support of its summary judgment motion. The trial court denied Chicago Title's supplemental request for judicial notice as "essentially an attempt to introduce new evidence on reply."

23

"against a defendant who is not voluntarily in court." Appellants also argued the finding of unclean hands was not a " 'necessarily decided' " issue because the court already found the Meridian deeds of trust unenforceable based on the forgeries.

Third, Appellants argued the unclean hands finding was "[i]rrelevant" to any "unclean hands against [Chicago Title]" because they "relate[d] to Meridian's 'procuring the trust deed and other loan documents,' " including "the alleged failure to notify the borrowers of the loan and failure to send them the loan documents." They argued their wrongful conduct as described in Judge McEachen's findings did not cause Chicago Title to fail to follow a provision in the escrow instructions requiring it to obtain bona fide signatures on loan documents.

The UFTA defendants filed a similar summary judgment motion in which they also sought judgment based on their unclean hands defense and, like Chicago Title, they sought to establish the defense by way of collateral estoppel, based on the decision in the Orange County action, and separately as a matter of undisputed material fact.

C.  *Trial Court Order Granting Summary Judgment on Issue Preclusion Grounds*

On December 17, 2018, after a hearing, the trial court issued an order granting summary judgment in favor of Chicago Title and the UFTA defendants. The court found the decision in the Orange County action met all of the elements of issue preclusion with regards to the application of the unclean hands doctrine and concluded Appellant's unclean hands barred any recovery.

On the first requirement—that the issue sought to be precluded from relitigation must be identical to that decided in the former proceeding—the trial court found that: "Chicago Title presents evidence the Orange County

24

action concerned loans made as part of the overall investment scheme perpetrated by Phan and Do.  Yazdani began foreclosure proceedings against the properties securing those loans, and two of the purported borrowers filed suit against Yazdani and Meridian . . . to clear title to their property because of forged deeds.  The facts giving rise to the Orange County action are the same facts underlying this case. . . . *This is essentially undisputed by Plaintiffs*.  Therefore, the identical issue requirement is met."  (Italics added.)

On the second requirement—that the issue must have been actually litigated in the former proceeding—the trial court focused on whether Appellants had an opportunity to litigate the unclean hands issue in the Orange County action.  It found that Appellants did.  The court noted that Appellants *"do not dispute" that they "had the opportunity to litigate the issues before the court*," rather they argued "the question of unclean hands was not properly before the Orange County court because unclean hands is an affirmative defense and therefore can only be used against a plaintiff."  (Italics added.)  The court agreed with Judge McEachen's reasoning that the Orange County plaintiffs were in a "defensive posture" because they sought to bar Meridian's affirmative attempt to foreclose on their home, and thus the unclean hands doctrine could be asserted against Appellants.  The trial court also found "there has never been a finding of any defect in Judge McEachen's original Statement of Decision and Judgment," since Appellants "sought to eliminate harmful portions of the Judgment through a settlement" rather than "wait[ ] for a ruling on their Motion to Set Aside the Judgment."

As to the third requirement—that the issue must have been necessarily decided in the former proceeding—the trial court found Judge McEachen "specifically held unclean hands was a basis for the decision and that it

mandated the remedy of cancellation of the deeds of trust" and "[t]herefore, it must be considered 'necessary' to the decision."

As to the fourth requirement—the decision in the former proceeding must be final and on the merits—the trial court noted this was the "most hotly contested by [Appellants]." The court rejected Appellants' argument that Judge McEachen's statement of decision was "a tentative decision." It ruled that the deleted portions of the decision could be considered "final" notwithstanding the vacatur. It reasoned that under *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810 (*Stonewall*) and *Sandoval v. Superior Court* (1983) 140 Cal.App.3d 932 (*Sandoval*), "stipulating to remove language from an adverse judgment does not allow a party to escape the collateral estoppel effect of the adverse ruling." Further, the parties' stipulation that the decision would " 'remain in full force and effect' " was an acknowledgement of the decision's finality. It rejected Appellants' effort to attack the decision as procedurally or substantively flawed, reasoning that there had "never been a finding of any defect in Judge McEachen's original Statement of Decision and Judgment" and that Appellants had waived the right to attack its merits by eliminating parts of it by settlement rather than await a ruling on their motion to vacate or pursue appeal.

Finally, the trial court addressed, and rejected, Appellants' argument that Judge McEachen's unclean hands finding was "[i]rrelevant" to Chicago Title's unclean hands defense because they only "relate[d] to Meridian's 'procuring the trust deed and other loan documents,' " including "the alleged failure to notify the borrowers of the loan and failure to send them the loan documents." The court found "the conduct underlying the Orange County court's unclean hands finding relied on essentially the same evidence

26

presented in this case," both actions "directly relate to the fraudulent scheme perpetrated by Phan and Do" and both cases "relate directly to the same transaction." The court stated that "by its nature, a Ponzi scheme relies on a pyramid of transactions that are necessarily connected. The transactions analyzed in the Orange County action were integral to the Ponzi scheme, and therefore involved the same subject matter as those raised in this action."

Finding all the elements of issue preclusion had been met for application of the unclean hands defense, the trial court ruled Appellants were precluded from any recovery and granted summary judgment in favor of Chicago Title and the UFTA defendants. It did not reach the merits of the parties' remaining arguments for summary judgment or summary adjudication. On January 3, 2019, the court entered a judgment in favor of Chicago Title and a judgment in favor of the UFTA defendants. Appellants appealed both judgments. Thereafter, the court awarded Chicago Title $943,250 in attorney fees based on a prevailing party fee provision in the lender's escrow instructions signed by Yazdani. Appellants also appealed this order.

## DISCUSSION

### I.

### *Governing Legal Principles*

#### A. *Standard of Review*

Summary judgment is appropriately granted when the moving party establishes there is no triable issue of material fact and that it is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Company* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact

27

in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid*.)

When a defendant moves for summary judgment, the defendant has the initial burden of presenting evidence sufficient to establish either that the plaintiffs cannot prove one or more elements of their causes of action, or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* 25 Cal.4th at p. 853.) If the defendant does so, the burden then shifts to the plaintiffs to produce admissible evidence demonstrating that there is a triable issue of material fact as to the claim or defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar,* at p. 850.) Theories that are not supported by evidence will not raise a triable issue. (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163, 166 (*Sangster*) ["bare assertion" that the moving parties " 'fabricated' " evidence insufficient to avoid summary judgment].)

A trial court's decision to grant summary judgment is reviewed de novo. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.) "We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." (*Ibid*.) Appellate review of a trial court's application of the doctrine of issue preclusion (the preferred term for collateral estoppel) is also de novo. (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 156.)

" '[A]lthough we use a de novo standard of review here, we do not transform into a trial court.' " (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379 (*Dinslage*).) We approach a summary judgment appeal, as with any appeal, with the presumption the appealed judgment is correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Therefore, " ' "[o]n review of a summary judgment, the appellant has the

28

burden of showing error, even if he did not bear the burden in the trial court.' ' " (*Dinslage, supra,* 5 Cal.App.5th at p. 379.)

" 'Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments.' " (*DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 676 (*DiCola*).) Because it is the Appellants' burden to affirmatively demonstrate error, they must provide citations to the appellate record directing the court to the evidence supporting each factual assertion. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Bernard v. Hartford Fire Ins. Co.* (1991) 226 Cal.App.3d 1203, 1205 ["It is the duty of a party to support the arguments in its briefs by appropriate reference to the record, which includes providing exact page citations."].) The parties to an appeal may not refer to matters outside the record on appeal. (Cal. Rules of Court, rule 8.204(a)(2)(C); *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 453, fn. 6.) The reviewing court is not required to develop the parties' arguments or search the record for supporting evidence and may instead treat arguments that are not developed or supported by adequate citations to the record as waived. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1011.) " ' " 'In other words, review is limited to issues which have been adequately raised and briefed.' " ' " (*Dinslage, supra,* 5 Cal.App.5th at p. 379.)

B.     *The Doctrine of Unclean Hands*

"The defense of unclean hands arises from the maxim, ' " 'He who comes into Equity must come with clean hands.' " ' [Citation.] The doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

29

"The defense is available in legal as well as equitable actions." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 978.) However, "the unclean hands doctrine is not a legal or technical defense to be used as a shield against a particular element of a cause of action. Rather, it is an equitable rationale for refusing a plaintiff relief where principles of fairness dictate that the plaintiff should not recover, regardless of the merits of his claim. It is available to protect the court from having its powers used to bring about an inequitable result in the litigation before it." (*Id.* at p. 985.) "The doctrine promotes justice by making a plaintiff answer for his own misconduct in the action. It prevents 'a wrongdoer from enjoying the fruits of his transgression.'" (*Id.* at p. 978.)

"Not every wrongful act constitutes unclean hands. But, the misconduct need not be a crime or an actionable tort. Any conduct that violates conscience, or good faith, or other equitable standards of conduct is sufficient cause to invoke the doctrine." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979; see *Degarmo v. Goldman* (1942) 19 Cal.2d 755, 764 ["Any unconscientious conduct upon his part which is connected with the controversy will repel him from the forum whose very foundation is good conscience. [Citation.] Nor will equity aid him who is guilty of breach of contract connected with the transaction concerning which he asks for a decree in his favor."].)

The misconduct must also " ' " 'prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief.' " ' " (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.) "The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain to the very subject matter involved and affect the

equitable relations between the litigants." (*Fibreboard Paper Prods. Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 728.)

The determination of whether the unclean hands defense applies "cannot be distorted into a proceeding to try the general morals of the parties." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.) "The issue is not that the plaintiff's hands are dirty, but rather ' " 'that the manner of dirtying renders inequitable the assertion of such rights against the defendant.' " ' " (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 846.) Under the doctrine of unclean hands, "any evidence of a plaintiff's unclean hands in relation to the transaction before the court or which affects the equitable relations between the litigants in the matter before the court should be available to enable the court to effect a fair result in the litigation." (*Kendall-Jackson*, at p. 985.)

C.    *The Law of Issue Preclusion*

"The law of preclusion helps to ensure that a dispute resolved in one case is not relitigated in a later case. Although the doctrine has ancient roots [citation], its contours and associated terminology have evolved over time. We now refer to 'claim preclusion' rather than 'res judicata' [citation], and use 'issue preclusion' in place of 'direct or collateral estoppel' [citations]." (*Samara v. Matar* (2018) 5 Cal.5th 322, 326 (*Samara*).)

"Claim and issue preclusion have different requirements and effects." (*Samara*, *supra*, 5 Cal.5th at p. 326.) "*Claim preclusion* 'prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them.' " (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824 (*DKN Holdings*).) "Claim preclusion arises if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit." (*Ibid.*)

31

"*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action. [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action." (*DKN Holdings, supra,* 61 Cal.4th at p. 824.) "[I]ssue preclusion applies (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.)

Even if these threshold requirements are satisfied, courts may consider the public policies underlying issue preclusion in determining whether the doctrine should be applied. (*Murray v. Alaska Airlines* (2010) 50 Cal.4th 860, 879 (*Murray*).) These policies include "conserving judicial resources and promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and avoiding the harassment of parties through repeated litigation." (*Ibid.*)

On appeal, Appellants raise challenges to the first three elements for application of issue preclusion—finality, identical issue, necessarily decided—and assert that public policy does not support giving Judge McEachen's unclean hands finding preclusive effect in this case. We address each of Appellants' contentions in turn and conclude none has merit.[9]

---

[9] On April 1, 2020, Chicago Title filed an unopposed motion seeking judicial notice of (1) the April 19, 2017 statement of decision and (2) the June 7, 2017 stipulated order for vacatur, entered in the Orange County action. The trial court took judicial notice of these court records when it ruled on the summary judgment motions. (Evid. Code, §§ 452, subd. (d)(1) [providing that a court may in its discretion take judicial notice of records of any court of this state], 459, subd. (a)(2) [providing that a reviewing court may take judicial notice of any matter the trial court has properly judicially noticed or should have judicially noticed].) Accordingly, this motion for judicial notice is granted.

## II.

### *Trial Court Did Not Err in Giving Preclusive Effect to the Unclean Hands Finding and Granting Summary Judgment*

A.    *Finality*

Appellants' first challenge is to the requirement of finality.  Appellants argue the trial court erred in giving preclusive effect to Judge McEachen's statement of decision and judgment because it was not a final decision having been partly vacated as a condition of settlement.  However, they do not cite legal authority demonstrating that finality in this context is lacking.  Instead, they argue that cases relied on by the trial court in its order granting summary judgment (*Sandoval, supra,* 140 Cal.App.3d 932 and *Stonewall, supra*, 46 Cal.App.4th 1810) and cases additionally relied on by Chicago Title in its motion for summary judgment (*City of Laguna Beach v. Mead Reinsurance Corp.* (1990) 226 Cal.App.3d 822 (*City of Laguna Beach*) and *Norman I. Krug Real Estate Investments, Inc. v. Praszker* (1994) 22 Cal.App.4th 1814 (*Norman I. Krug*)) are distinguishable from the circumstances present here.  They also contend that the decision in the Orange County action lacked finality because it was never appealed.  We reject Appellants' contentions and conclude that the decision satisfied the requirement of finality for purposes of issue preclusion.[10]

_____

[10]    In their opening brief on appeal, Appellants assert that Judge McEachen failed to issue a tentative decision or tentative statement of decision before issuing the statement of decision, but they fail to cite anything in the record demonstrating that this assertion is true.  They also assert that Judge Monroe entered the stipulated order based on a finding that Judge McEachen's decision was erroneous, another assertion that lacks record support (and Appellants' counsel conceded at oral argument that the record does not bear out this contention).  Because these points are unsupported by the record on appeal, we need not and do not consider them. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979.)  On August 18,

California follows section 13 of the second Restatement of Judgments, which addresses the finality requirement as it pertains to issue preclusion. (See *Sandoval, supra,* 140 Cal.App.3d at p. 936.) Section 13 states that "[t]he

---

2020, the same date they filed their reply brief on appeal, Appellants filed a motion with this court seeking judicial notice pursuant to Evidence Code sections 452 and 459 of (1) a request for statement of decision filed on April 4, 2017 on behalf of Yazdani and Meridian in the Orange County action; (2) a motion to vacate statement of decision and judgment filed on May 4, 2017 on behalf of Yazdani and Meridian in the Orange County action; and (3) a minute order entered on June 7, 2017 relating to an "Ex-Parte Application for an Order Vacating Portions of the Statement of Decision and Judgment" reciting that the court (Judge Monroe) had "fully considered the arguments of all parties" and ruling that the "Ex-Parte Application for an Order Vacating Portions of the Statement of Decision and Judgment" was "granted as requested." Chicago Title has opposed the request. We deny the motion insofar as it seeks judicial notice of the foregoing documents. "An appellate court may properly decline to take judicial notice under Evidence Code sections 452 and 459 of a matter which should have been presented to the trial court for its consideration in the first instance." (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 325–326 .) Moreover, an appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal." (*Guarantee Forklift, Inc. v. Capacity of Texas, Inc.* (2017) 11 Cal.App.5th 1066, 1075 (*Guarantee Forklift)*.) Appellants did not present these records to the trial court in connection with their opposition to the summary judgment motion and have offered no explanation for their failure to do so. They delayed seeking judicial notice until the time their reply brief was due, depriving Chicago Title of the opportunity to address the new matters in its respondent's brief on appeal. Additionally, we have reviewed these documents and conclude they do not establish that Judge McEachen failed to issue a tentative decision (the parties' dispute over this assertion being the apparent impetus for Appellants' decision to seek judicial notice of the first record) or that Judge Monroe accepted and executed the stipulated order based on a determination of the merits of the pending motion to vacate (the apparent purpose for which judicial notice of the second and third records was requested). Accordingly, we deny Appellants' motion on the grounds that it is late and seeks judicial notice of matters that were not before the trial court when it decided the summary judgment motion and that are irrelevant to the disposition of this appeal.

34

rules of res judicata are applicable only when a final judgment is rendered. However, for purposes of issue preclusion (as distinguished from merger and bar [i.e., claim preclusion]), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be *sufficiently firm to be accorded conclusive effect*." (Rest. 2d Judgments (1982) § 13, italics added; see *Sandoval*, at p. 936.)

The Restatement cautions that in considering whether a particular judgment is "sufficiently firm to be accorded conclusive effect," courts should "determine that the decision to be carried over was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered. Thus preclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion." (Rest. 2d Judgments, *supra*, § 13, *com.* g*;* see *Sandoval, supra*, 140 Cal.App.3d at p. 936.) " ' "Finality" in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.' " (Rest. 2d Judgments, *supra,* § 13, Reporter's Note to *com.* g, quoting *Lummus Co. v. Commonwealth Oil Ref. Co.* (2d Cir. 1961) 297 F.2d 80, 89.)

*Sandoval* and other cases decided in its wake support the conclusion that a judgment entered after trial and later vacated or subsumed by a dismissal as a condition of settlement remains "sufficiently firm" and thus final for purposes of issue preclusion. In the prior litigation at issue in *Sandoval,* a jury found by special verdict that the design of a machine was

35

defective.  (*Sandoval*, *supra*, 140 Cal.App.3d at p. 935.)  The court entered judgment for plaintiffs and the defendant manufacturer appealed.  (*Ibid.*)  While the appeal was pending, the parties reached a settlement, and the plaintiffs signed a full release stating the manufacturer did not admit liability and agreed to dismiss their action with prejudice.  (*Ibid.*)  In a separate action, another plaintiff sued the same manufacturer for injuries caused by the same machine.  (*Ibid.*)  That plaintiff sought to rely on the finding of design defect from the prior action under the doctrine of collateral estoppel.  (*Ibid.*)  The trial court ruled the doctrine did not apply because the first action was never final.  (*Ibid.*)

The Court of Appeal disagreed, holding that "once the appeal is settled favorably to the plaintiff and thereafter dismissed, the Restatement analysis and reason itself dictate that the trial court judgment reemerges with sufficient finality to permit the application of collateral estoppel." (*Sandoval*, *supra*, 140 Cal.App.3d at p. 937.)  The *Sandoval* court saw "nothing in the dismissal with prejudice concept that forecloses a finding of finality sufficient to preclude relitigation of the issues decided against the defendant.  This is particularly true when the agreement to dismiss with prejudice is part of a substantial settlement in plaintiff's favor after a final judgment in the trial court.  Such a settlement and dismissal of the lawsuit can fairly be construed as a judgment favoring plaintiff on the merits.  To hold otherwise would exalt form over substance." (*Id.* at p. 939, fn. omitted.)

Our Supreme Court has agreed with *Sandoval* and has followed its reasoning.  (See *Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 911 (*Producers Dairy*) [following *Sandoval*, holding that a settlement reached after affirmance on appeal but before the time to petition for review expired did not disturb the finality of the judgment, and explaining

36

that "settlement of a prior adjudication during the pendency of an appeal may render the judgment sufficiently final to support the doctrine of collateral estoppel, provided other factors of certainty and finality are satisfied"].)

And while *Sandoval* involved a post-judgment settlement and dismissal, courts have also given preclusive effect to judgments vacated as a condition of settlement. *Stonewall* was such a case. There, a jury returned a special verdict in favor of a homeowner and against the City of Palos Verdes Estates on theories of negligence, nuisance, and inverse condemnation. (*Stonewall*, *supra*, 46 Cal.App.4th at p. 1823.) Pending appeal, the parties settled the action in exchange for payment of an amount less than the judgment, "together with a stipulation (confirmed in an order of court) vacating the judgment 'for all purposes.' " (*Ibid.*) In a subsequent contribution action, some of the city's insurance carriers denied coverage based on inverse condemnation exclusion clauses in the city's policies. (*Id.* at pp. 1823–1824.) The trial court found the prior judgment could not be relied on to show the funds paid in settlement were in satisfaction of a judgment for inverse condemnation. (*Id.* at p. 1840.)

In the ensuing appeal, the city argued that "the court order based on the stipulation settling the [homeowner's] case pending its appeal vacated the . . . judgment for all purposes and that the judgment and the jury verdict on which it was based are nullities." (*Stonewall*, *supra*, 46 Cal.App.4th at p. 1840.) The Court of Appeal disagreed. Relying on section 13 of the Restatement Second of Judgments and *Sandoval*, the appellate court held that "[w]here an underlying action against a governmental entity proceeds upon the theory of inverse condemnation, a judgment is entered against the entity, and pending appeal the case is settled with a stipulation that the

37

judgment be vacated and the appeal is thereupon abandoned, collateral estoppel precludes the entity's denial that its liability was in inverse condemnation." (*Stonewall*, at p. 1840.)

The *Stonewall* court also relied on *City of Laguna Beach, supra*, 226 Cal.App.3d 822, another case that involved a settlement and vacatur of a judgment entered after a jury trial. There, a jury returned a special verdict finding the City of Laguna Beach liable to homeowners for inverse condemnation. Pending appeal, the parties settled. As a condition of settlement, they "stipulated that the judgment . . . would be vacated and set aside, which stipulation was ordered into effect by the trial court." (*Id.* at p. 828.) The city's insurance carrier denied coverage based on inverse condemnation exclusion clauses in the city's policies. (*Ibid.*) In the indemnification action that followed, the trial court ruled, among other things, that the city could introduce evidence of its own negligence at trial to show that inverse condemnation was not the basis of recovery in the prior action. (*Ibid.*)

On appeal, the city argued that "the basis of its liability to the [homeowners] is still unsettled" and "there is no final judgment fixing legal liability extant in the [homeowners'] case." (*City of Laguna Beach, supra*, 226 Cal.App.3d at pp. 831–832.) The Court of Appeal disagreed. It reasoned "there was both a trial (fully and vigorously testing the allegations of inverse condemnation) and a judgment -- a judgment entered on a jury verdict firmly fixing the city's liability . . . under a theory of inverse condemnation[.]" (*Id.* at p. 831.) It also rejected the city's contention that the order vacating the judgment had restored the case to its previous status " 'as though the order or judgment had never been made' " (*id.* at pp. 831–832), reasoning that "the vacating of the judgment . . . left intact the jury verdict finding the city liable

under a theory of inverse condemnation" (*id.* at p. 832). It also noted that the state of affairs in which the city found itself "is solely attributable to the peculiar settlement agreement entered into by the city" and that "the only possible explanation for this settlement agreement that suggests itself to [the court] is a desire on the part of the city to first create and then impose an indemnification obligation on [its insurer] that would not otherwise have arisen under the facts surrounding this entire episode." (*Id.* at p. 832, fn. 4.)

*Sandoval*, *Stonewall*, and *City of Laguna Beach*, if not directly on point, are persuasive and provide a guide for determining whether Judge McEachen's decision in this action remained final for purposes of issue preclusion even after it was vacated pursuant to the parties' settlement. We conclude that it did. We begin our analysis by observing that at the time it was issued, the decision bore the hallmarks of certainty and finality. (*Producers Dairy*, *supra*, 41 Cal.3d at p. 911.) It was a statement of decision and judgment issued after a bench trial and was not "avowedly tentative." (Rest. 2d Judgments, § 13, com. g.) The statement of decision reflects a full opportunity to present evidence and witnesses and thoughtful and detailed consideration of this evidence by Judge McEachen. The decision was "adequately deliberated and firm." (*Ibid.*) Judge McEachen devoted several pages of the decision to the issue of Appellants' unclean hands and evaluated the merits of this issue in a thorough and "reasoned opinion." (*Ibid.*)

The sequence of events that followed Judge McEachen's issuance of the decision is analogous to the sequence of events that followed the judgments given preclusive effect in *Sandoval*, *Stonewall*, and *City of Laguna Beach*, and supports the conclusion that the later settlement and stipulated vacatur did not undermine its finality for purposes of issue preclusion. A statement of decision issued after a bench trial explains the factual and legal bases for

39

the trial court's decision (Code Civ. Proc., § 632) and in that respect is the functional equivalent of the special jury verdicts entered in the foregoing cases. Appellants challenged the decision by motion to vacate and reached a settlement with the plaintiffs while that challenge was pending. Much as in *Stonewall* and *City of Laguna Beach,* the parties agreed to vacate the judgment as a condition of settlement. Under their agreement, Vincent and Huyen retained the relief they were awarded at trial (quiet title in their home), making their settlement at least as favorable to them as the post-appeal settlements by which the prior actions at issue in *Sandoval*, *Stonewall*, and *City of Laguna Beach* were resolved. In *Sandoval*, *Stonewall*, and *City of Laguna Beach*, the dismissal or vacaturs entered as a condition of settlement were held not to disturb the finality of the preceding judgment. The similarity in the sequence of events that led to the stipulated vacatur in this case suggests the same result should obtain, and that Judge McEachen's decision remained final for purposes of issue preclusion notwithstanding the vacatur.

Appellants argue that *Sandoval*, *Stonewall*, and *City of Laguna Beach* are distinguishable because in those cases the decisions accorded preclusive effect were settled pending appeal, whereas here, there was no appeal. We disagree that this difference is a sufficient basis for declining to follow these courts' reasoning. The absence of an appeal does not compel the conclusion that a judgment is not final for purposes of issue preclusion. Under section 13 of the second Restatement of Judgments, whether "the decision was subject to appeal or was in fact reviewed on appeal" is a factor to consider in evaluating the decision's finality, not an element that must be present to accord the decision preclusive effect. (Rest. 2d Judgments, § 13, com. g; accord *Murray*, *supra*, 50 Cal.4th at pp. 875–876.)

Moreover, courts have given issue-preclusive effect to decisions that were never reduced to judgment or appealed. (See, e.g., *Murray*, *supra*, 50 Cal.4th at pp. 866–879 [agency finding adverse to employee could be given issue-preclusive effect in a later lawsuit by the employee even though the finding was never subject to judicial review]; *Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1561–1566 [court ruling in minute order sustaining demurrer was " 'sufficiently firm' " to be final for purposes of issue preclusion although no judgment was ever entered]; *Rymer v. Hagler* (1989) 211 Cal.App.3d 1171, 1175–1176, 1179 (*Rymer*) [determination of coverage in an order issued by a Workers' Compensation Appeals Board judge was a final order for purposes of collateral estoppel even though the proceeding was subsequently dismissed by the employee]; see also *Bryan v. State Farm Mut. Auto. Ins. Co.* (2012 Md. Ct. Spec. App.) 205 Md. App. 587, 939–947 (*Bryan*) [collecting cases, including *Sandoval*, and holding, under Maryland law as informed by section 13 of the Restatement Second of Judgments and other authorities, that a jury verdict entered after the liability phase of a bifurcated trial had preclusive effect although it was never reduced to judgment because the parties settled before the damages phase of trial commenced].)

Appellants argue that rulings vacated on appeal are a " 'nullity.' " However, the cases Appellants cite for this proposition (*Regents of University of California v. Public Employment Relations Bd.* (1990) 220 Cal.App.3d 346, 356 and *Grain Dealers Mutual Ins. Co. v. Marino* (1988) 200 Cal.App.3d 1083, 1088–1089) involved reversal on the merits. These cases do not address the circumstance where the vacatur is entered pursuant to a settlement. Moreover, Appellants ignore that this very argument—that a vacated judgment is a legal nullity—was rejected in *Stonewall* and *City of*

*Laguna Beach* as a basis for avoiding the preclusive effect of the decision on which the judgment was based.

Appellants assert the stipulated order for vacatur placed the unclean hands finding "beyond appellate review." This argument borders on specious. As the trial court in this case noted, if Appellants wanted judicial review, they could have obtained it—they need only have awaited a ruling on their motion to vacate, and if that result was unsuccessful they could have filed an appeal. Appellants do not argue, in other words, that the decision itself was not appealable; they contend that by vacating it, they no longer had a reason to appeal. Under *Murray*, *supra,* 50 Cal.4th at page 872, Appellants' voluntary decision to forego judicial review is not a circumstance that defeats issue preclusion.

In *Murray*, an employee's administrative complaint was resolved adversely to him in a letter decision. (*Murray*, *supra*, 50 Cal.4th at pp. 865–866.) The employee was notified that he had the right to object and seek a hearing before an administrative law judge in a process that, had the employee pursued it, allowed for review by the Court of Appeals for the Ninth Circuit. (*Id.* at pp. 867–868.) He did not object, and the agency's findings became final. (*Id.* at pp. 868–869.) Our Supreme Court held the adverse findings could be given preclusive effect in a subsequent lawsuit filed by the employee against his employer, explaining the employee's failure to exercise his right to judicial review supported this conclusion. (*Id.* at p. 877.) " 'It is the opportunity to litigate that is important in these cases, not whether the litigant availed himself or herself of the opportunity.' " (*Id.* at p. 872, quoting *Rymer*, *supra*, 211 Cal.App.3d at p. 1179.) Here, Appellants do not claim Judge McEachen's decision was unappealable as a matter of law. Rather,

Appellants eliminated the possibility of judicial review by virtue of their stipulation.

Appellants contend that *Sandoval*, *Stonewall*, *City of Laguna Beach*, and *Bryan* are distinguishable because the prior decisions deemed preclusive in those cases resolved issues of liability, or because the later actions (at least, *Stonewall* and *City of Laguna Beach*) involved claims of indemnification arising from the earlier actions. While these differences do exist, Appellants fail to articulate a persuasive reason why the differences matter and should lead us to reject these courts' reasoning. Accordingly, we decline to do so. Appellants also contend the outcome of *Stonewall* and *City of Laguna Beach* was informed by a desire to prevent the city from avoiding the "obvious basis of liability reflected in the jury's special verdict." Although they appear to regard this as another distinguishing fact, if anything, the same circumstance is present here: Appellants inform us in their appellate briefs that their motive for seeking a stipulated vacatur was to remove the adverse unclean hands finding from Judge McEachen's decision.

What does make this case different from the foregoing cases is that here, it was the decision itself that was vacated (at least in part), whereas in *Stonewall* and *City of Laguna Beach*, the judgments were vacated, leaving the underlying special jury verdicts intact. However, the process by which the vacatur was accomplished in this case leads us to conclude that it did not disturb the decision's finality for purposes of issue preclusion.

First, as we have explained, courts have overlooked orders of vacatur entered as a condition of settlement. (*City of Laguna Beach*, *supra*, 226 Cal.App.3d at p. 832; *Stonewall*, *supra*, 46 Cal.App.4th at p. 1840; see also *Bates v. Union Oil Co.* (9th Cir. 1991) 944 F.2d 647, 650–652 (*Bates*) [applying federal law and holding that a district court order vacating a

43

judgment to effectuate the parties' settlement did not disturb the judgment's preclusive effect because the district court had failed to balance " 'the competing values of finality of judgment and right to relitigation of unreviewed disputes' " before vacating the judgment].)

Second, nothing in the stipulation and proposed order by which the decision was partially vacated indicated the decision itself lacked certainty or finality.  (*Sandoval*, 140 Cal.App.3d at p. 936.)  The partial vacatur left the results of the trial intact while purporting to gut the court's rationale for its decision, for no stated reason other than that the parties had agreed to this as a condition of settlement.  Although Appellants assert the stipulation should be taken as a concession by Vincent and Huyen of the merits of their motion to vacate, nothing in the stipulation (or anything else in the record) reveals this to be true.  (See footnote 10, *ante*.)  To the contrary, the stipulation was as limited as can be:  the recital—the section of the stipulation that informs the court why the parties entered into their agreement—took up just ten lines of text and said nothing more than that Appellants had a motion to vacate pending, and that "in recognition of the substantial expense and time involved in litigation (including post-trial motion and appellate expenses), and to conserve judicial resources" the parties "have agreed to settle."  Absent from the stipulation was any indication that Vincent and Huyen had conceded the motion to vacate had merit.

The proposed order submitted with the stipulation was even less informative.  Its only rationale for invoking the court's authority was a perfunctory and thinly supported finding of good cause:  "[t]he foregoing stipulation having been duly considered by the Court, and good cause showing therefrom, [¶] GOOD CAUSE APPEARING, IT IS THEREFORE

44

ORDERED . . . ." Nothing about this generic recitation of good cause conveyed that Judge Monroe determined Judge McEachen's decision was legally or procedurally flawed, or that Judge Monroe entered the stipulated order vacating the decision for any reason other than to effectuate the parties' settlement.

Third, we do not ignore that the judge who entered the stipulated order for vacatur was not the judge who presided over the trial. Ordinarily, one trial judge cannot overturn the order of another trial judge. (*Paul Blanco's Good Car Co. Auto Group v. Superior Court* (2020) 56 Cal.App.5th 86, 99–100.) "A narrow exception to this venerable rule applies when the record shows that the original judge is no longer 'available.'" (*Id.* at p. 100.) Here, we have been offered no explanation why the stipulation was not presented to the trial judge, and the record fails to answer this question. Even if we were to assume Judge McEachen was unavailable, it is self-evident that a judge who presides over a trial, wrestles with the parties' contentions, and produces a statement of decision resolving their disputes, is more likely to weigh the consequences of deleting his own work product.

Fourth, the stipulation and proposed order submitted to Judge Monroe failed to convey that he was informed about the parties' claims, the trial proceedings that led to the decision he was being asked to partly vacate, or, perhaps most importantly, the potential collateral consequences of vacating the decision's adverse findings against Appellants. *Bates*, *supra*, 944 F.2d 647, is instructive in this regard. In *Bates*, the district court granted a motion to vacate a judgment entered after a jury trial, the vacatur being a condition of a settlement reached while the case was pending appeal. (*Id.* at pp. 648–649.) The court granted the parties' motion " 'so that the parties would settle the case' " (*id.* at p. 649) without considering " 'the competing

45

values of finality of judgment and right to relitigation of unreviewed disputes' " (*id.* at p. 650). In the Ninth Circuit, district courts are authorized to deny stipulated requests to vacate judgments based on these competing values, known as *Ringsby* factors, "because, otherwise, 'any litigant dissatisfied with a trial court's findings would be able to have them wiped from the books.' " (*Ibid.*, quoting *Ringsby Truck Lines, Inc. v. Western Conference of Teamsters* (9th Cir. 1982) 686 F.2d 720, 721.) When the vacated judgment was submitted to the same judge in a different case for its issue-preclusive effect, the judge recognized he had granted the motion to vacate to effectuate a settlement and had not considered the potential consequences of vacatur. (*Bates*, at p. 649.) The judge gave the judgment issue-preclusive effect notwithstanding the vacatur, stating: " 'My order of vacatur says nothing about the preclusive effect of the . . . judgment, nor does it indicate my opinion on it. I vacated the . . . judgment so that the parties would settle the case.' " (*Ibid.*)

The Ninth Circuit affirmed, holding "that the [prior] judgment did not lose preclusive effect simply because it was vacated, and that the *Ringsby* factors, although not considered at the time the [prior] judgment was vacated, were properly considered by the district court when, in this case, it confronted the question of the preclusive effect of the vacated judgment." (*Bates*, *supra*, 944 F.2d at p. 650.) Here, much like the district court in *Bates*, the record gives no indication Judge Monroe entered the stipulated order for any reason other than to effectuate the parties' settlement. The record fails to indicate that Judge Monroe considered whether the vacatur could or should undermine the preclusive effect of Judge McEachen's findings. Under the reasoning of *Bates*, which we find persuasive, this circumstance weighs in

46

favor of the conclusion that Judge McEachen's decision "did not lose preclusive effect simply because it was vacated." (*Ibid.*)

Fifth, public policy considerations support a finding of finality. " 'The critical question is whether the [collateral estoppel] doctrine applies to those issues of a . . . trial that are fully litigated whether resolved by a final judgment or by a retraxit [i.e., a dismissal entered as a condition of settlement] after verdict or decision of the court. If collateral estoppel is not applicable, the . . . trial becomes a vehicle by which a defendant can . . . litigate identical liability issues a number of times in multiple actions arising from the same transaction.' " (*Sandoval*, *supra*, 140 Cal.App.3d at p. 938.)

*Norman I. Krug*, *supra*, 22 Cal.App.4th 1814, discussed the public policies implicated here, albeit in a different procedural context. In *Norman I. Krug*, the Court of Appeal was presented with a joint application for stipulated reversal filed in connection with a settlement reached on appeal. In the underlying action, a real estate broker was found to have breached his duty of care by failing to disclose information to parties to a real estate transaction. (*Id.* at p. 1820.) The Court of Appeal declined to reverse this determination, noting the "dangerous public policy implications" of "a settlement-generated reversal in a case such as this." (*Id.* at p. 1823.) "Permitting a licensee to 'buy his way out' from under a judgment which might form the basis for disciplinary action by settling at the appellate level would not only reduce incentives for wealthier licensees to conform their conduct to the standards imposed by their profession but also render it less likely that they will settle cases *prior* to judgment, since a licensee-defendant is more apt to gamble on taking his case to trial if the disciplinary consequences of an unfavorable judgment may ultimately be avoided by settling the case in the Court of Appeal." (*Ibid.*)

47

Similar concerns pertain here. Although we have not been informed that Judge McEachen's finding had possible disciplinary consequences for Yazdani or Meridian (which was presented as a lender in the transactions at issue), it is still the case that the finding of Appellants' unclean hands had ramifications beyond the Orange County action. Moreover, Appellants' defense in the Orange County action was, so they inform us, funded through their title policy, giving them the ability to litigate without personal cost and to use the threat of continued litigation as a bargaining chip. Vincent and Huyen, by contrast, were fighting to quiet title to their home. Appellants' ability to threaten continued litigation gave them a significant advantage; it was a strategy that cost them little but put their opponents at tremendous personal risk. The parties' settlement of the Orange County action did not change its outcome; Vincent and Huyen still prevailed in quieting title to their home. The only difference that resulted from the settlement was that Appellants succeeded in deleting unfavorable findings from a judicial decision. Judicial integrity would be undermined if we were to conclude the stipulated order that resulted from this scenario deprived Judge McEachen's decision of its finality. (See *Neary v. Regents of University of California* (1992) 3 Cal.4th 273, 288 (*Neary*) (dis. opn. of Kennard, J.) ["To casually discard a presumptively correct trial court judgment, without any showing of legal error, cannot help but demoralize trial judges and jurors."].)[11]

---

[11] In 1999, the Legislature amended Code of Civil Procedure section 128, subdivision (a)(8), to reverse the rule and presumption in favor of stipulated motions for reversal established by the *Neary* majority. (See *Hardisty v. Hinton & Alfert* (2004) 124 Cal.App.4th 999, 1005 [discussing this history].) This development makes the views expressed in Justice Kennard's dissent all the more persuasive.

For all these reasons, we conclude that Judge McEachen's decision was sufficiently firm, and therefore final for purposes of issue preclusion, notwithstanding Judge Monroe's stipulated order partly vacating it.[12]

B.   *Identical Issues*

Next, Appellants argue the unclean hands finding in the Orange County decision does not satisfy the " 'identical issue' " or " 'necessarily decided' " elements of issue preclusion.  Although Appellants address both issues together under a single heading in their opening brief on appeal, these requirements are distinct (see, e.g., *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341–342 (*Lucido*) [listing " 'identical issue' " and " 'necessarily decided' " as separate elements of collateral estoppel]), so we analyze them separately.

We consider Appellants' challenge to the identical issue requirement first.  Their arguments are somewhat disorganized, making it difficult to determine which of their points relate to which requirement.  So far as we can determine, Appellants' argument is that unclean hands is an equitable defense, and "[t]he equitable issues are alarmingly different between the two actions."  Appellants assert that in the Orange County action, their opponents were not "Chicago Title or a defendant in a position similar to Chicago Title" but rather victims of the Ponzi scheme perpetrated by "Chicago Title's Do."  They also appear to argue that their role as party

_____

[12]   In its respondents' brief on appeal, Chicago Title argued that under *Southern Cal. White Trucks v. Teresinski* (1987) 190 Cal.App.3d 1393, 1407, trial courts are not statutorily authorized to vacate a judgment for the purpose of effectuating a settlement.  Chicago Title did not raise this argument in the trial court and thereby forfeited it.  Moreover, because we resolve Appellants' challenge to the decision's finality on other grounds, it is not necessary for us to reach this issue.

49

defendants in one case but plaintiffs in another makes the two actions insufficiently identical.

Chicago Title responds that Appellants did not challenge the identical issue requirement in their opposition to summary judgment. It notes that the trial court specifically found the issue undisputed. Chicago Title also argues that to the extent Appellants' argument has not been forfeited, it lacks merit because the Orange County action concerned Appellants' misconduct in connection with the same transactions and subject matter involved in this case, which it asserts is all that the unclean hands defense requires.

We have reviewed the record and conclude Appellants have forfeited this challenge. Appellants' summary judgment opposition brief raised no dispute regarding the identity of the unclean hands issues. " 'Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments.' " (*DiCola, supra*, 158 Cal.App.4th at p. 676.) "Though this court is bound to determine whether defendants met their threshold summary judgment burden independently from the moving and opposing papers, we are not obliged to consider arguments or theories, including assertions as to deficiencies in defendants' evidence, that were not advanced by plaintiffs in the trial court." (*Ibid.*) "Ordinarily the failure to preserve a point below constitutes a [forfeiture] of the point. [Citation.] This rule is rooted in the fundamental nature of our adversarial system: The parties must call the court's attention to issues they deem relevant. ' "In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' " (*North Coast Business Park v.*

50

*Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28–29 (*North Coast*).) "Indeed, if this were permitted procedure, parties opposing and losing summary judgment motions could attempt to embed grounds for reversal on appeal into every case by their silence." (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 873 (*Saville*).)

In their reply brief on appeal, Appellants claim they did raise their current arguments in their summary judgment opposition brief. However, they base this claim on two nonconsecutive sentences that appear in different sections of their 25-page summary judgment opposition brief ("The issue of Meridian or Yazdani's unclean hands was not before the Orange County court" and "The issue before the Orange County Court was whether the deeds of trust were enforceable"), neither of which can fairly be construed as a challenge to the "identical issue" element of issue preclusion.

Appellants also assert in conclusory fashion that they have not forfeited their challenge to the identical issue requirement because it does not qualify as a " 'new theory of liability, defense, or damages' " and therefore it can be raised for the first time on appeal. In support of their assertion, they cite a series of sections from a litigation guide discussing forfeiture based on the prohibition against raising new theories on appeal, none of which offers specific support for Appellants' position. We find Appellants' argument too undeveloped and unsupported to be persuasive. (See *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 498 [" 'We may and do "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." ' "].)

Moreover, Appellants overlook the general rule of forfeiture that applies where a party fails to assert error in the trial court. (See *North*

51

*Coast*, *supra*, 17 Cal.App.4th at p. 28 [discussing the "general principles of 'waiver' and 'theory of the trial' "].)  The rule of forfeiture through inaction applies to summary judgment appeals.  (See *id.* at p. 29; *DiCola*, *supra*, 158 Cal.App.4th at p. 676 [" 'An argument or theory will . . . not be considered if it is raised for the first time on appeal.' "]; *Saville*, *supra*, 133 Cal.App.4th at p. 872.)  Holding Appellants to the preservation requirement is particularly appropriate where, as here (as Appellants acknowledge) the application of the unclean hands doctrine was the "centerpiece" of the summary judgment motion.

Appellants claim we can consider their belated challenge because it presents an issue of law on undisputed facts.  Appellate courts do have the "discretion to address questions not raised in the trial court when the theory presented for the first time on appeal involves only a legal question determinable from facts that are (1) uncontroverted in the record and (2) could not have been altered by the presentation of additional evidence." (*Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237–1238.)  However, "[m]erely because an issue is one of law, does not give a party license to raise it for the first time on appeal. . . .  Whether an appellate court will entertain a belatedly raised legal issue always rests within the court's discretion." (*Farrar v. Direct Commerce, Inc.* (2017) 9 Cal.App.5th 1257, 1275, fn. 3; see *Wittenberg v. Bornstein* (2020) 51 Cal.App.5th 556, 567 (*Wittenberg*) ["While . . . authorities recognize an appellate court's discretion to consider forfeited arguments that raise pure questions of law, none imposes a mandatory duty to do so."].)  While courts are more inclined to exercise this discretion and consider new legal issues where the public interest or public policy is involved, this case involves "a private dispute and does not implicate matters of public interest or policy." (*Wittenberg*, at p.

567.) Moreover, Appellants' challenge to the identical issue requirement, as they have framed it, requires a comparison of the relative moral blameworthiness of their opponents in each of the two cases. It is difficult to characterize such a determination as one that could not be altered without further factual development.

Appellants failed to present their current arguments in the trial court, and the court resolved the motion with the understanding that the identical issue requirement "is essentially undisputed by Plaintiffs." We "are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider."[13] (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.) Accordingly, we deem Appellants' challenge to this issue forfeited.[14]

---

[13] Moreover, under Code of Civil Procedure section 437c, subdivision (f)(2), "[a] party shall not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court unless that party establishes, to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion." This prohibition can be overcome, but only in the exercise of judicial discretion. (*Marshall v. County of San Diego* (2015) 238 Cal.App.4th 1095, 1106.) Had Appellants raised this issue below, Chicago Title might have been able to present evidence addressing their contention about relative equities, affording both it and the trial court the opportunity to address the issue on a developed record. Reversing the judgment based on Appellants' belated and underdeveloped assertion is not only inefficient and unfair to the trial court and Chicago Title, it also results in potentially expending Chicago Title's only opportunity to pursue summary judgment.

[14] In the motion for judicial notice that Appellants filed on the same date they filed their reply brief on appeal, Appellants requested judicial notice of a statement of decision issued in an action filed by Hai Nguyen in Santa Clara County Superior Court. Appellants contend the statement of decision shows

53

C.    *Necessarily Decided*

As we have noted, in the same section of their opening brief in which Appellants assert their challenge to the element of identity, they also dispute whether the issue of their unclean hands was " 'necessarily decided' " in the Orange County action.  "Courts have understood the ' "necessarily decided" ' prong to 'require[ ] only that the issue not have been "entirely unnecessary" to the judgment in the initial proceeding[.]' "  (*Samara, supra,* 5 Cal.5th at p. 327, quoting *Lucido, supra,* 51 Cal.3d at p. 342.)

Appellants argue the unclean hands finding in Judge McEachen's decision was not "necessarily decided" because unclean hands is an affirmative defense that cannot be asserted against a defendant.  They acknowledge that Judge McEachen reasoned the doctrine was used defensively as he applied it since the plaintiffs brought their suit to defend themselves against Appellants' foreclosure, but they argue this reasoning was erroneous because the underlying foreclosure was a nonjudicial proceeding.[15]

---

that different factfinders can reach different conclusions on the issue of whether Appellants acted with unclean hands.  We deny the request.  An appellate court "may decline to take judicial notice of matters not relevant to dispositive issues on appeal." (*Guarantee Forklift, supra,* 11 Cal.App.5th at p. 1075.)  There is no indication in the statement of decision that the superior court considered or decided the issue of Appellants' unclean hands.  Accordingly, the decision is not relevant to the issues before us.

[15]    Appellants' argument on the issue of the foreclosure being nonjudicial is difficult to understand.  In their opening brief on appeal, they assert there was no " 'affirmative claim' for judicial foreclosure."  They then state that the nonjudicial foreclosure that precipitated plaintiffs' suit was not an " 'action' " under California law.  They cite *Garfinkle v. Superior Court* (1978) 21 Cal.3d 268, 272–282 for the proposition that nonjudicial foreclosure proceedings do not come within the scope of the California due process clause, and *Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998–999, where our

Appellants' arguments amount to assertions that Judge McEachen's decision was wrongly decided. Their arguments are misplaced, however, because a prior judgment is preclusive even when there are doubts about its correctness. "[R]egardless of the propriety of the summary judgment, it is nonetheless binding since 'for purposes of application of the doctrine of [issue preclusion], an erroneous judgment is as conclusive as a correct one.'" (*White Motor Corp. v. Teresinski* (1989) 214 Cal.App.3d 754, 762–763; accord *Esparza v. County of Los Angeles* (2014) 224 Cal.App.4th 452, 467 (*Esparza*) [rejecting argument that a prior court's interpretation of a statute was "'not necessary'" to its decision as "merely an argument that the . . . court's decision was wrongly decided"]; *Lumpkin v. Jordan* (1996) 49 Cal.App.4th 1223, 1232 ["The federal court order is entitled to collateral estoppel effect regardless of our agreement or disagreement with the decision itself."]; see *Lamb v. Wahlenmaier* (1904) 144 Cal. 91, 95 ["The judgment is none the less a bar for the reason that it was erroneous."].) In *Esparza*, the parties seeking to avoid the preclusive effect of a prior court ruling argued the ruling conflicted with settled state law and was therefore "'not necessary'" to the earlier court decision. (*Esparza*, *supra,* 224 Cal.App.4th at p. 467.) The

high court explained that a bank setoff is not an "action" within the meaning of Code of Civil Procedure section 22. Appellants do not explain what conclusion we should derive from these assertions. Their failure to adequately develop their point with meaningful legal analysis forfeits the argument. (*Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817; see *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 ["'We are not bound to develop appellants' arguments for them.'"].) In their reply brief, Appellants cite *Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1154 (*Gomes*) for the first time, but they fail to explain why. Whatever argument they intended to make in reliance on *Gomes*, it is forfeited for lack of adequate development and for failure to assert it in their opening brief. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518 [points raised for first time in reply brief are waived].)

Court of Appeal rejected this contention as "merely an argument that the district court's decision was wrongly decided," reasoning that " ' " 'an erroneous judgment is as conclusive as a correct one.' " ' " (*Ibid.*, quoting *Lumpkin*, *supra*, 49 Cal.App.4th at p. 1232.) Likewise, here, Appellants' disputes with the soundness of Judge McEachen's reasoning are not a basis for concluding his findings were "unnecessary" or not issue-preclusive.

Additionally, "[i]t is the general rule that a final judgment or order is res judicata even though contrary to statute where the court has jurisdiction in the fundamental sense, i.e., of the subject matter and the parties." (*Pacific Mut. Life Ins. Co. v. McConnell* (1955) 44 Cal.2d 715, 725.) "Errors which are merely in excess of jurisdiction should be challenged directly, for example by motion to vacate the judgment, or on appeal, and are generally not subject to collateral attack once the judgment is final[.]" (*People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 661.) Appellants do not argue that issues of subject matter jurisdiction or personal jurisdiction tainted the decision. Rather, they quarrel with Judge McEachen's reasoning. Appellants had the opportunity to raise their concerns by directly challenging the decision, which, as the trial court in this case noted, would have occurred if they had waited for a decision on their motion to vacate or filed an appeal. (See, e.g., *ibid.* ["[e]rrors which are merely in excess of jurisdiction should be challenged directly, for example by motion to vacate the judgment, or on appeal"].) Appellants elected not to pursue this course and cannot now collaterally attack Judge McEachen's reasoning.

Next, citing *Branson v. Sun-Diamond Growers* (1994) 24 Cal.App.4th 327 (*Branson*), Appellants argue that "any statement by the Orange county court regarding [their] 'unclean hands' was dicta." We disagree. "[D]ictum consists of general observations of law which go beyond the facts and issues

56

of the case." (*People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1773 (*Yuki*).) In *Branson*, the Court of Appeal considered the issue-preclusive effects of conclusions in an earlier appellate opinion. In the prior appeal, the appellate court had been tasked with reviewing a trial court order issued in response to a motion for indemnification brought pursuant to Corporations Code section 317. (*Branson*, *supra,* 24 Cal.App.4th at p. 335.) After determining that the trial court erred in granting statutory indemnification, the appellate court went on to conclude that the parties also could not establish a basis for indemnification on grounds independent of the statute. (*Id.* at p. 337.) The *Branson* court held the latter statements were dicta and not necessary to the decision, since matters apart from the parties' statutory right to indemnity were not before the court. (*Id.* at p. 348.)

Here, Judge McEachen's unclean hands finding was not dicta. The evidence of Appellants' misconduct and the determination that Appellants acted with unclean hands were a substantial focus of the decision and not mere commentary on extraneous issues of fact or law. (*Yuki*, *supra*, 31 Cal.App.4th at p. 1773.) Judge McEachen made the unclean hands finding in resolution of the controverted issue "[w]hether title to [the property] should be quieted in favor of [Vincent and Huyen] by cancellation or otherwise invalidating the Meridian [deeds of trust]." Resolution of this issue required the judge "to declare the rights of the parties in realty" because " ' " [t]he object of the [quiet title] action is to finally settle and determine, as between the parties, *all conflicting claims to the property in controversy*, and to decree to each such interest or estate therein as he may be entitled to.' " ' " (*Robin v. Crowell* (2020) 55 Cal.App.5th 727, 740, italics added.) "The purpose of a quiet title action is to determine any adverse claim to the property that the defendant may assert, and to declare and define any interest held by the

defendant, ' "so that the plaintiff may have a decree finally adjudicating the extent of his own interest in the property in controversy." ' " (*Ibid.*; see also *Ridgway v. Ridgway* (1949) 95 Cal.App.2d 46, 50 [holding that "[i]n an action to quiet title, even though defendant does not file a cross-complaint or ask for any affirmative relief, a decree declaring that defendant has title, and enjoining plaintiff from further setting up a claim thereto, is a proper form of judgment"].)  Judge McEachen's unclean hands finding served as one of the grounds on which he resolved Appellants' claim on Vincent and Huyen's property.  The finding was plainly intended to be dispositive of the question before the court and it was not extraneous or unnecessary to the resolution of the issues presented.  Accordingly, the unclean hands finding cannot reasonably be characterized as dicta.

D.     *Public Policy Considerations*

Finally, Appellants argue that even if the threshold requirements of issue preclusion are met, the doctrine should not be applied in this case on grounds of public policy.  The public policies underlying the doctrine of issue preclusion include "conserving judicial resources and promoting judicial economy by minimizing repetitive litigation, preventing inconsistent judgments which undermine the integrity of the judicial system, and avoiding the harassment of parties through repeated litigation." (*Murray*, *supra*, 50 Cal.4th at p. 879.)  Here, Appellants contend that "equitable considerations" and " 'fundamental principles of fairness' " counsel against giving Judge McEachen's decision preclusive effect in this case.

Appellants' "equitable considerations" argument repeats and elaborates on their earlier contention that the "relative equities between the parties" in the Orange County action and this action differ, making it unfair to hold them to the prior unclean hands finding in this case.  They assert that

58

Chicago Title was the more blameworthy actor, including because it did not "bother[ ] to tell Yazdani and Meridian" about defects in the deeds of trust discovered during the audit of Do and because it "allow[ed] them instead to initiate a trustee's sale . . . [that] Chicago Title knew was doomed to fail." (Italics omitted.) Appellants assert that Chicago Title also acted wrongfully (through Do) by failing to "obtain legitimate signatures on the loan documents" as required by the lender's escrow instructions, and that this "failure to follow the instructions" "directly caused Yazdani and Meridian's loss in the Orange County action."

Chicago Title responds that Appellants have forfeited this argument and the forfeiture cannot be excused because the argument relies on a factual record that Appellants have failed to develop. In reply, Appellants contend they did assert the argument in the trial court and cite pages of their summary judgment opposition brief and opposition separate statement of facts where they claim the argument or supporting facts can be found.

We have reviewed Appellants' record citations and conclude they did not present their "equitable considerations" argument in the trial court. No such argument appears in their summary judgment opposition brief. Their opposition separate statement does not set forth all of the facts on which they base their current argument (e.g., that Chicago Title "allow[ed] [Appellants] . . . to initiate a trustee's sale process that [it] knew was doomed to fail"; that Chicago Title's failure to follow escrow instructions "directly caused Yazdani and Meridian's loss in the Orange County action"). Because Appellants' "equitable considerations" argument was not raised or factually developed in the trial court, we decline to consider it now. (*DiCola*, *supra*, 158 Cal.App.4th at p. 676 [" 'possible theories that were not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal' "];

59

*NBCUniversal Media, LLC v. Superior Court* (2014) 225 Cal.App.4th 1222, 1236–1237 [argument not raised in opposition to summary judgment forfeited where it required application of equitable principles to a factual record the party failed to develop]; *City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473, 1493 ["A party waives a new theory on appeal when he fails to include the underlying facts in his separate statement of facts in opposing summary judgment."].)

Appellants' next argument raises a dispute with a statement from the trial court's order granting summary judgment. Appellants complain that in its order granting summary judgment, the trial court stated that if Appellants "believed there was some deficiency in the [Orange County SOD (statement of decision)], procedural or otherwise, Plaintiffs could have waited for a ruling on the Motion to Vacate the Judgment or sought appellate review." Appellants contend the trial court's reasoning "utterly defeats judicial economy . . . [a] policy objective underlying issue preclusion." They essentially contend they should not be penalized for stipulating to vacate the judgment, since Vincent and Huyen purportedly conceded the merits of their motion to vacate and it would have been a "waste" of court resources to seek a court ruling on the motion.

Appellants do not make a persuasive case for reversal. To begin with, their argument ignores that we review the trial court's ruling, not its reasoning (*Fieldstone Co. v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357, 372) and relies on assertions that are not supported by the record (such as "[w]hen the opposing party does not contest, and in fact *concedes*, the merits of the motion"—the record reflects no concession by Vincent and Huyen to the merits of Appellants' motion to vacate) and which we therefore ignore.

60

More to the point, there was nothing wrong with the trial court's comment. The court was responding to Appellants' claims that Judge McEachen's decision was procedurally or legally deficient, a position Appellants struggled to demonstrate for the very reason the trial court identified—they decided to forego judicial review. And while Appellants complain it would have been inefficient to seek a court ruling on their motion to vacate, the judicial economy that issue preclusion seeks to promote is the avoidance of *repetitive* litigation, not litigation in the first instance. (See *Murray*, *supra*, 50 Cal.4th at p. 878.) Under *Murray*, a party that fails to exercise its rights of judicial review can properly be bound by the unchallenged decision in a later action. (*Id.* at pp. 877–878.) Moreover, if, as Appellants repeatedly complain, there were flaws in the decision and the parties were in agreement on this point, they could have said so in the stipulation with little loss of efficiency. (See *City of Laguna Beach*, *supra*, 226 Cal.App.3d at pp. 831, 832, fn. 4 [the state of affairs in which the city found itself was "solely attributable to the peculiar settlement agreement entered into by the city and the (plaintiffs)"].)

Appellants also claim the trial court was wrong to say they could have sought appellate review. Appellants claim this would have been "impermissible under the rules of appellate procedure" because once the stipulated order vacating portions of the decision was entered, they were no longer " 'aggrieved' " and had no reason to appeal. Obviously, this overlooks the trial court's point, which was that Appellants could have appealed the original decision instead of stipulating to vacate parts of it.

Next, Appellants assert that it is "worth noting" that an appeal would have been "futile" because the appellate court "would have simply affirmed the judgment without consideration of the unclean hands issue, as there was

61

a factual finding [that Vincent and Huyen] had not ratified the deed[s] of trust and it was undisputed their signatures were forged[.]" They contend that "[u]nder California law as it existed then" such an affirmance would have "cemented" the unclean hands finding. However, the latter statement does not correctly describe the state of California law when Judge McEachen's decision was issued in April 2017.

It is true that in *Samara, supra*, 5 Cal.5th 322, a 2018 decision, the California Supreme Court overturned longstanding precedent (*People v. Skidmore* (1865) 27 Cal. 287 (*Skidmore*)) and held that "a ground reached by the trial court and properly challenged on appeal, but not embraced by the appellate court's decision" has no preclusive effect. (*Samara, supra*, 5 Cal.5th at p. 334.) However, even before *Samara*, California appellate courts had declined to follow *Skidmore* in cases presenting questions of issue preclusion. (See, e.g., *Zevnik v. Superior Court* (2008) 159 Cal.App.4th 76, 86–88 (*Zevnik*); *Newport Beach Country Club, Inc. v. Founding Members of Newport Beach Country Club* (2006) 140 Cal.App.4th 1120, 1130–1132 (*Newport Beach Country Club*).) These courts held that a trial court judgment reached on alternative grounds and affirmed on appeal on only one ground loses its issue-preclusive effect as to the unreviewed ground. (See *Zevnik, supra,* 159 Cal.App.4th at pp. 86–88; *Newport Beach Country Club, supra*, 140 Cal.App.4th at pp. 1130–1132; see also *Butcher v. Truck Ins. Exchange* (2000) 77 Cal.App.4th 1442, 1460 ["We hold that if a court of first instance makes its judgment on alternative grounds and the reviewing court affirms on only one of those grounds, declining to consider the other, the second ground is no longer conclusively established."]; accord *People ex rel. Brown v. Tri-Union*

62

*Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1574.) Thus, an appeal would not have been "futile" in the sense Appellants contend.[16]

Next, Appellants repeat their unsupported assertion that Judge McEachen issued the statement of decision without first issuing a tentative decision, which they argue violated their right to due process of law. As this argument relies on an unsupported assertion (see footnote 10, *ante*), we decline to address it. (*Sangster*, *supra*, 68 Cal.App.4th at p. 166 ["bare assertion" that the moving parties " 'fabricated' " evidence insufficient to avoid summary judgment]; *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364 ["if it is not in the record, it did not happen"]; *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG*) ["Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by

---

[16] Appellants have not argued that Judge McEachen's decision was itself not preclusive for the reason that it relied on alternative grounds. The first Restatement of Judgments provided that a trial court decision that rests on independently sufficient alternative grounds is preclusive as to each ground. (See *Zevnik*, 159 Cal.App.4th at p. 83, discussing Rest., Judgments (1942) § 68, com. n, pp. 307–308.) "California opinions of that era followed the Restatement rule." (*Ibid.* [citing authorities].) In the second Restatement of Judgments issued in 1982, the American Law Institute reversed course and expressed the view that a trial court judgment based on independently sufficient alternative grounds is preclusive as to neither ground. (See *Zevnik*, *supra*, 159 Cal.App.4th at p. 83, citing Rest.2d Judgments (1982) § 27, com. i, pp. 259–260.) In *Zevnik*, at page 83, the Court of Appeal stated that it had found no California opinion on point dated after the Restatement Second; neither have we. When it decided *Samara*, the California Supreme Court expressly refrained from taking a position on "the significance of an independently sufficient alternative ground reached by the trial court and *not* challenged on appeal." (*Samara*, *supra,* 5 Cal.5th at p. 337.) Because Appellants have not raised this issue nor have they invoked the second Restatement, this case does not require us to decide whether to follow section 27 of the second Restatement.

63

accurate citations to the record."]; *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [point raised that lacks citation to record may be deemed forfeited].)

In their reply brief, Appellants claim for the first time that Judge McEachen also failed to issue a proposed judgment. This contention is doubly forfeited, because in addition to being belated, it is yet another assertion made without record support. (*American Indian Model Schools v. Oakland Unified School Dist.* (2014) 227 Cal.App.4th 258, 275–276 ["Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives the respondent of the opportunity to counter the appellant by raising opposing arguments about the new issue."].)

Finally, Appellants contend the fact that they were represented in the Orange County action by "*panel counsel*" of a Chicago Title affiliate indicates the proceedings were tainted by unfairness. As they cite no legal authority demonstrating that this circumstance creates a public policy concern (nor do we independently perceive that it does), we reject the claim. (*WFG*, *supra*, 51 Cal.App.5th at p. 894 ["[W]e may disregard conclusory arguments that are not supported by pertinent legal authority."].)

E.    *Conclusion*

Because we reject Appellants' challenges to the trial court's determination that the unclean hands finding from the Orange County decision was entitled to preclusive effect, we affirm summary judgment as to Chicago Title. We therefore need not, and do not, address the parties' remaining arguments relating to the merits of Chicago Title's motion for summary judgment or summary adjudication.

III.

64

*Appellants Fail to Establish Summary Judgment in Favor of the UFTA Defendants Should Be Reversed*

Appellants appealed the trial court's grant of summary judgment not only as to Chicago Title but as to the UFTA defendants as well. However, the UFTA defendants did not file a respondents' brief. But on appeal, the trial court's judgment is presumed correct, and the burden is on the Appellants to demonstrate reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) This is true even on de novo review (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6), and even if there is no respondents' brief (*Kriegler v. Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 226–227).

Here, although Appellants' opening brief seeks reversal as to all of the respondents, Appellants did not include any arguments specific to the UFTA defendants on the issue of the trial court's application of the doctrine of issue preclusion. Accordingly, the same analysis that supports affirming the judgment as to Chicago Title supports affirming the judgment as to the UFTA defendants.

## IV.

*The Trial Court Did Not Abuse Its Discretion in Awarding Attorney Fees to Chicago Title*

Appellants challenge the trial court's award of attorney fees to Chicago Title. Chicago Title requested attorney fees of $1,851,575 based on 3,366.5 total hours that its in-house counsel spent litigating the case and sought a blended hourly rate of $550 an hour. Appellants opposed the motion, arguing, among other things, that the fee request was grossly inflated and on this basis should be denied in its entirety. The trial court granted the motion in part and awarded reduced fees of $943,250, after recalculating the lodestar by reducing certain attorneys' hours and adjusting their rates based on the tasks performed. Appellants claim the trial court abused its discretion and,

under *Serrano v. Unruh* (1982) 32 Cal.3d 621 (*Serrano*), the court should have awarded no fees at all.  We disagree.

A trial court's award of attorney fees is reviewed for an abuse of discretion.  (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.)  " 'The scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action[.]" Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " (*Horsford v. Board of Trustees of California State Univ.* (2005) 132 Cal.App.4th 359, 393.)

Under *Serrano*, "[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." (*Serrano, supra,* 32 Cal.3d at p. 635.)  Although Appellants argued in their opposition to Chicago Title's motion that the attorney fee request was grossly inflated, we have reviewed the court's eight-page order evaluating the motion and granting fees and see no indication the court agreed with Appellants' characterization or found that the special circumstance in *Serrano* existed.  Even assuming the court had reached this conclusion (and we do not perceive that it did), under *Serrano*, it had the option to respond by reducing *or* denying the award; it was not required to deny it.  (*Ibid.*)  Thus, even if we were to agree with Appellants that the fee request here was unreasonably inflated, the trial court's award is one of the responses contemplated by *Serrano*; there was no abuse of discretion.

Moreover, courts of review recognize that "[t]he 'experienced trial judge is the best judge of the value of professional services rendered in his [or her] court[.]' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49.)  Thus, while a trial court's " 'judgment is of course subject to review, it will not be disturbed

66

unless the appellate court is convinced that it is clearly wrong.'" (*Ibid.*) Accordingly, "[t]he only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.) In addition, the Appellants have the burden on appeal to demonstrate the trial court abused its discretion in awarding fees. (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 169.) Here, Appellants do not challenge the trial court's calculation of the lodestar or offer any basis upon which we might conclude that the fee award was excessive in comparison with the work actually performed. Appellants have therefore failed to carry their burden of demonstrating that the trial court's fee award should be reversed.

Accordingly, we affirm the trial court's order awarding attorney fees to Chicago Title.

## DISPOSITION

The judgment in favor of Chicago Title, the award of attorney fees to Chicago Title, and the judgment in favor of the UFTA defendants are affirmed. Chicago Title is entitled to its costs on appeal.

67

                                                    DO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.